We hear first from Mr. O'Connor. Good morning, Your Honor. Good morning. May it please the Court, counsel. My name is Benjamin O'Connor. I represent the appellants in this case who are the heirs to Danny Ray Thomas, a 35-year-old man who was shot and killed by Deputy Cameron Brewer of Harris County Sheriff's Office. Mr. O'Connor, I noted when you were substituted to make this argument, you're listed as lead counsel. I didn't see your name on the brief. Your Honor, the person whose name was on the brief left our firm, and so I've jumped on on the last second to . . . I'm sorry. I can't hear you. The person whose name was on the brief . . . Right. . . . left our firm. Right. And so the case was offered to me for oral argument, and I was just trying to put it in place there so that I could appropriately get oral argument. All right. Lead counsel . . . previous lead counsel has left the case. You might want to move the microphone. Yes, ma'am. Can you hear me okay? Thank you. Again, we're here . . . we only have a limited amount of time, and there's a variety of issues that came up in our briefs. And I'd like to focus our discussion today first for Deputy Brewer on the issue which remains before the Court and was dismissed, the . . . whether or not Mr. Thomas had a clearly established right to be free of excessive force on the date in question. We postulate, Your Honor, that . . . on Earth . . . that this is that rare, obvious case where the case . . . where the right is clearly established. We recognize the rarity of that, but the circumstances and the facts are such to justify that. Do you believe there is a fact issue on when Deputy Brewer knew of Mr. Thomas' state of excited delirium or whether Mr. Thomas could have grabbed the gun? Do you believe there are any looming fact issues? That's something that we would say would go to the jury. What would go to the jury? There are no fact issues, was he armed? There's no fact issues there. Because you're saying he wasn't armed? He was not armed, ma'am. But the . . . but Brewer would not have known that. It's hard to be armed when your pants are down at your ankles. Your Honor, that's the . . . that's the issue that we're bringing up. And I guess what I was . . . He was a very large man. You're talking about the . . . Mr. Thomas or are you talking about Mr. Brewer or Deputy Brewer? Thomas. He was listed at 5'9"-6". That's actually a fact issue. Deputy Brewer was identified as being 6'4"-300 pounds. So we would argue that there's a fact issue as to whether Mr. Thomas was a large man. And there does not appear to be an issue, whether you understand 6'4"-300 to be large, that there was a fact issue regarding whether Deputy Brewer was a large man. What there could be any fact issue on is Mr. Thomas' state, whether he was either excited delirium, mental crisis. We, of course, believe that he was. How far away he was. The . . . it's four feet away. Whether or not he was armed, if he had anything on him. We postulate that there were no fact issues there, but recognize that that could be something for a jury. And whether or not he . . . What's for a jury? I'm sorry. Whether or not he was armed, we say he was not. Whether or not he was threatening in any way, we argue he was not. But that is . . . we argue that's a fact issue. Well, he kept advancing on the deputy, didn't he? He kept advancing. That's not disputed. That's not disputed. There's video evidence of that. There's not evidence of him lifting his hands, making a striking motion. Actually, another point of fact that's worth thinking about as well, and when understanding Deputy Brewer's mindset, recall in the video, another motorist confronted Mr. Thomas. A smaller motorist, according to the video, shoves Mr. Thomas. Mr. Thomas goes back and doesn't fight back. He doesn't strike this motorist in any way. That's something also . . . Did he see all of that, or is that an issue? I would say it's not an issue. We have dash cam . . . his dash cam footage of that. So, whether in the moment he said he saw that. So, that's not an issue. And so that's another thing to suggest that he was not, in fact, a threat. The only thing that could potentially be that he could be a threat was that he continued to advance towards him. Now, there's no evidence that he said anything threatening. There's no evidence that he . . . He did tell the policeman at least 10 times, right? 10 times might be a bit of dispute. It seems to be, according to the video, he did defy the policeman's request to stay down, or command to stay down. It was a short period of time. It's 16 seconds in our brief. Upon re-review of the video, it really does seem like Deputy Brewer, between the time he gets out of the car to when you hear the gunshots, about 10 seconds. But again, that's a fact issue. What's your best clearly established case? I guess you were going to talk about clearly established. That says if you're not armed and you're not . . . your life is not in danger, that you shouldn't use deadly force. That it's not . . . It has to be commensurate force. What is your best case in our circuit or the Supreme Court that would say that? I guess what I would say, fact issue wise, it's hard to find a case where you have an unarmed, non-threatening . . . But a disobedient, you know, unarmed . . . Disobedient. Disobedient. Correct. The two cases that we cite for prior precedent, Cole versus Carson, Graves versus Zachary, actually the person there had a gun. And this court found that that was an obvious violation. I guess I'd take a step back when we discuss what's our best case. We'd actually say our best case would be Garner and Graham. And just the Brousseau case by the Supreme Court states, you can use those as a basis for determining whether or not something was obvious. Was there . . . So taking Graham, for instance. Taking those factors, severity of crime, immediate threat to safety of officers and others, actively resisting arrest. Recall the district court found very strongly in favor of Mr. Thomas on those first two factors, said he was actively resisting arrest and ending or was trying to get away. He wasn't trying to get away. I submit there's a fact dispute as to whether he was even under arrest. The degree of resisting arrest, his mental capacity for resisting arrest. So I guess, long story short, it's hard to find an all-fours case where you're going to have a situation that's pretty parallel to this. And I think this is a good example of why . . . The fact of the matter is, and you can correct me of course, you don't have a case that's on all-fours with this case, do you? No, Your Honor, and unfortunately, I think that's one of the reasons why this might be that rare obvious case. This case might have to be that precedent. Do we have the rare obvious case in the Fifth Circuit anymore? Is that standard . . . I'm just asking, when has the last time we've ever said there's a rare obvious case? It was the Graves case, it was 2008, and Carson was 2019. So that's after the Mullenix decision by the Supreme Court in 2015 that was more . . . said it needs a little bit more granularity. So I would submit those. I believe Newman was earlier before that, 2012. So those are some cases that we're leaning on in those particular circumstances. There's other cases, the Hobart case, but that's a . . . Has the Supreme Court reminded us that this is still a viable theory? I don't believe it has, but it certainly hasn't overcome . . . said that this is not an issue whatsoever. It has not overruled that fact. What would be the outcome in another circuit? Do you know that, or have you done that research? Unfortunately, Your Honor, I don't have that right in front of me. I believe, to be honest with you, maybe in the Seventh Circuit this stuff has come up, but I can't sit here today and say I have. How do we factor the fact that this is a summary judgment, genuine dispute of material fact, and then if there's none, then whether you're entitled to judgment as a matter of law? It's obvious how we factor in genuine dispute on Problem 1, whether it was a violation of a statutory or constitutional right, here in the Fourth Amendment. How do we factor in the summary judgment, genuine dispute question on clearly established? Because, Your Honor . . . I'm not saying you don't. I'm asking how do you do that? Are you saying it's just an issue of law? I'm not, Your Honor. All right. So how do we input this standard of review? The United States Supreme Court said you can use . . . Brousseau said you can use the Graham factors when assessing whether something's an obvious case. The Graham factors are very highly fact intensive. Severity of the crime. Immediate threat to safety. No, for . . . I think maybe I'm wrong. I think Judge Barksdale's asking about qualified immunity, and the issue there is no reasonable police officer could have believed that this fellow presented a threat. The second prong of the qualified immunity test. Sorry about that, Your Honor. I guess what I'm trying to say is whether a reasonable officer would have thought that, that by nature is an objective, fact-intensive inquiry, and courts have found that qualified immunity can be fact-specific. I recognize the concern for whether or not this is an issue of law, but there's specific things. You're not allowed, for example, to exceed . . . Sorry, there's fact-intensive aspects of that. You know what? My time is somewhat limited. I don't know if I . . . I was going to turn to that next. Please. Was the fact that Sheriff Gonzalez fired Deputy Brewer right after the incident, citing Brewer's violation of the Sheriff's Office policy, cut against your argument that the Harris County policy was somehow deficient? Or does it not? Can you not look it after the fact? Well, sir, we would argue that it does not cut against it, but that argument can be made. Let me make these few points, maybe, on the county issues. There's a variety of things we raised. Let's focus on the fact that Deputy Brewer was in a situation where he was ill-equipped from a . . . our argument, ill-equipped from a training standpoint and then actually from a literal equipment standpoint. So I want to focus specifically on . . . there's three things. Failure to train. The lack of less-lethal equipment. Recognize he had a taser. I'm not going to fight that, but I'll discuss that. And his end of failure to review. That he was fired after the fact doesn't necessarily mean things were off to snuff. It just means they had a use-of-force policy, which is very . . . which we state is constitutional. There are things that happened with regard to Deputy Brewer that we argue forbade him from adhering to that use-of-force policy. There's a discussion of a use-of-force continuum in the use-of-force policy. He did not have access to anything less lethal than a gun, and he had a taser. He did not have any other . . . He had a taser. He had a taser. He had handcuffs and other things, didn't he? He had handcuffs. Didn't have a baton. Did not have . . . He had a taser. Yes, ma'am. And, in fact, the people on the scene, for what it's worth, filming it said, oh, he's going to get tased. Correct. And they were shocked. This may be a positive comment for you, but that he was shot instead of tased. Correct. And maybe . . . I'm sorry, I didn't mean to interrupt you. No, no, no. So what's wrong with them giving him a taser and some handcuffs and a gun? Why does he have to have a baton also? Because he . . . Maybe there's a fact-specific aspect of this, too, that I want to raise. Deputy Brewer had an experience with a taser previously. I don't know if you recall this, but I want to say it was in 2015, where he tased somebody and it, in his mind, didn't work. It didn't sufficiently subdue the suspect. But it doesn't mean you don't have to try that in escalating . . . I guess . . . I'm sorry. I guess I'm raising the issue of fact question here specifically. Yes, he should have used a taser from a fact standpoint. Or just grab the guy or handcuff him because . . . I guess these are all . . . He's not putting up any kind of fight, and he's out of it, and he's in a zone. I couldn't have said it better myself, Brian. So I think we see that there's a fact issue, whether if he had other equipment that would have helped with that. Also, he wasn't trained . . . I shouldn't have called him the guy, the decedent. Excuse me. I didn't mean it. No problem. I understand, Your Honor. Thank you. Also, it's important. I think it tends to be a little bit overstated. He wasn't trained . . . He had an incident with a taser where it didn't work. He wasn't trained in 2016, 17, 18 in lethal force. I want to make sure I get these right. He wasn't trained in less lethal force in 2016 and 2018. So he has this incident in 2015. He isn't trained from 2016 to 2018 in both lethal use of force and non-lethal use of force. Did he have training . . . So he never had any more training after he had a negative incident? That's what the record states. And so that, I think, is enough to . . . Why . . . Sure, he had been qualified before with use of training, but why is he . . . and this is what we say . . . Did they know that he was uncomfortable with the taser because of this incident? Had he reported that to his supervisor and then nobody gave him any help? I think that's what the record states, Your Honor, and I think that actually speaks to the . . . Our third issue of my time runs short, so I'll answer this question. The idea of the review process that, remember, was more ad hoc at that time. It wasn't set up. That's another one of our big arguments. A review process like that would have additionally lent more credence to what he was stating and would have maybe subdued that concern that he had about a taser so that when he goes to a situation with only a taser, only a gun, and his person, he would have used it more wisely. I'll save the rest of my time for rebuttal. Thank you for your time, Your Honor. Okay, thank you. Mr. Cobb. Good morning, Your Honors. Good morning. Counsel. Counsel. We rely a great deal upon Magistrate Ho's memorandum and opinion because I think she succinctly set out and was also ratified by Judge Wareland three issues that she felt the appellants did not meet. Among those, there is no cases that establish a clear right as the case law says they must. The second is, she found that there was no robust consensus of authority that would show that what Officer Deputy Brewer did at the time was a violation of constitutional standard. And three, that there wasn't an act that was within the third category, which is not an obvious violation of constitutional law. The cases that were cited by the appellant, as was the same ones pointed out by Magistrate Ho, was that these cases aren't precedent. Not only were they not precedent, they didn't really have the same analogy to the situation confronting Deputy Brewer. Those cases that they cited usually went with the situation where the officer, even after the person had been what we call noncombative, disarmed, not a danger, continued further force. This is not what happened in this case. In this case, the facts are not disputed that Mr. Thomas advanced upon Deputy Brewer. Deputy Brewer warned him. The video shows how he warned him several times to stop, to stop, to get on the ground. He wouldn't do it. We even warned him that he was going to be shot if he didn't. Is it your point that it's constitutional to shoot someone who is disobeying a command and advancing towards an officer regardless of— Uh-huh. That's right, Your Honor. Is it your position that it's constitutional to shoot someone who is advancing and disobeying a command regardless of whether they are armed or in a position to— I think as a general overall policy in the world today that we live in, Your Honor, and the realities of what happens out on the street, I think it's very plausible. I think it's very constitutional. So you don't have to use only escalating force anymore, so that you would have to use a lower level of force if he didn't propose a life-and-death threat to the officer or the surrounding community? Life-and-death threats, that therein lies, as they say, the $64 question, Your Honor, because each case has to be looked at on its own. The objective reasonableness of the officer. No officer wants to be able to, I say this generically, but no officer wants to go ahead and just kill somebody randomly. This man, as was brought out by the Appellant's Counsel, Deputy Brewer, had experienced a traumatic incident involving a person who was in the same delirium state induced by drugs, which Mr. Thomas was on PCP at this time. We don't know he's in a delirium state for sure at this point. I'm sorry, I'm having— We don't know that this gentleman was in a delirium state. We know he was on the drugs, but whether or not he had that superhuman strength delirium state, we don't know. Well, we don't. We don't know, and that's the whole point. We don't know. How close was he to the officer when he got shot? He was within four feet of the officer. Four feet, so that poses the risk of stealing the officer's weapon or his taser. Exactly, Your Honor, and that was the instance in which Brewer discharged his weapon. When Mr. Thomas came that close to him, he presented a danger, and I agree with Judge Ho's finding that he had, at that point, committed a resistance to lawful authority, and Brewer shot him, and he shot him because he was in fear of what was going to happen to him, either serious bodily injury or possibly death. No, but the Sheriff's Department didn't think that it was appropriate. Well, the Sheriff's Department has other standards that are higher than what the courts have, believe it or not. Of course. And, you know, I commend them for that issue, but they do. They have higher standards, but it also should be noted that in the brief filed by appellant, they claim that Officer Brewer was charged criminally, which he was, but a jury acquitted him. They failed to point that out. Also, he was reinstated by the Harris County Civil Service Commission after they reviewed the evidence in the case. So he's currently a Harris County officer? I'm sorry? So he's currently back with Harris County? And I apologize for my hearing, Your Honor. I'm sorry, I don't want to yell at you. No, I understand. Is he currently then back with Harris County Police? Subsequently to his being reinstated, he resigned. He didn't want to be in law enforcement anymore after this. Is it your position that in the Fifth Circuit we don't have a clear and obvious case standard and that you have to have a case directly on point? I don't believe the law says you have to have a case directly on point, but I would say that the Fifth Circuit does not have a clear and obvious standard when it comes to these particular fact situations. So was your client not in a position to use a taser on anybody who is on drugs and so the taser is off the table every time they confront someone on drugs? I wouldn't know how to answer that, Your Honor, in the sense that he has a trepidation about using the taser as do many officers. But is that a special circumstance of this officer rather than what an objectively reasonable officer would do in this situation? An objectively reasonable officer in this situation would have used the taser, wouldn't they have? At least as a first go-to. I would say that some would, but some wouldn't. I mean, one of the cases that they've cited ironically concerns a taser and the officers were held . . . one of the officers was held liable because of the instance of using the taser too much. So there's a lot of dispute as to the effectiveness of the taser going on right now among the experts.  Does that go to the jury though then? I'm sorry, Your Honor. If there's disputes among the experts about whether someone should use the taser instead in these circumstances, then does that make it a jury question in this particular unique circumstance as you point out? No, Your Honor. No, Your Honor. It doesn't in my opinion because you're asking for an alternative use of force and what we have to deal with as far as the law is concerned is the force that was used at that time. Well, if there had been a legitimate tribal issue about that, wasn't the burden on the plaintiff to produce an expert? Yes, Your Honor. They did and we have one also, but you know, there's . . . your speculation is what I'm saying. You speculate that by use of the taser, automatically that's going to resolve the problem and the answer to that question is you can't. You don't know that. There's too many histories where the taser has been ineffective. But that's why you escalate. Well, when you're in a situation and even the rules manual of the sheriff's department says that we use a continuum of force, even when the situation escalates to the point where you can't use certain weapons, you have to use what's available to you and that you had. At the start of this incident, you stated that it's on the record that he was four feet away from the officer when the officer shot him. Yes, sir. Yes, Your Honor. How far away was he at the start of the incident? Is that clearly . . . It's in the . . . Is that a non-tribal issue? Is that a no dispute of material fact about that? Your Honor, that's no dispute. The video shows. He was . . . and I'm using my phrase. He was . . . I would say he was . . . No, no. What does the record show? How many feet was he away from the officer when he started to approach him? In the record, the video just shows he's several, several feet away when he starts approaching the officer. Well, four feet is several feet, so he was surely . . . Oh, he's greater than that. He was at . . . the scene in the record shows him at a middle of an intersection with several cars. This is Mr. Thomas acting in a . . . I'm sorry, my . . . Shall I finish, Your Honor? Go ahead. He's pounding on cars in an aggressive manner, and when he's approached, you can see the distance between him and Brewer is many feet. I'd say several car lengths. Brewer is ordering him at that point to stop, to get on his feet. He comes towards Brewer, and then the rest is shown on the video. When he gets within four feet is when he's shot. Okay. We have your argument. Thank you. Thank you, Your Honor. Mr. Hopkins? Good morning. May it please the Court, I'm Seth Hopkins representing Harris County. Harris County cannot be liable under either Section 1983 or the Americans with Disabilities Act under the facts of this case. I'll first address the civil rights claim and then the ADA. Monell established a strict criteria to hold a public entity responsible for the acts of its employees. A plaintiff must show that an official policymaker promulgated an official policy, our custom, that caused his constitutional rights to be violated. Further, that policy had to be implemented with deliberate indifference, which means Harris County had to know the relevant facts and draw the inference that the policy created a substantial risk of harm. I'll first address the four policies that the plaintiffs brought up, that the appellants brought up. First, the use of force. When Ed Gonzalez inherited the nation's third largest sheriff's office in 2017, it already had a use of force policy, and appellants have admitted on page 28 of their brief that policy 501 is constitutional. I don't believe that's in dispute today. Did they know that this particular officer had some sort of personal trauma that he wasn't going to use this taser on someone he thought might be on drugs? Did they know this such that they should have gotten him some training or something to deal with this trauma of the officers? And I'm not minimizing that in any way. No, Your Honor. I don't believe there's evidence that they were aware of it. There's no evidence they were even aware of it? I mean, a low-level supervisor may have known something, but there's certainly no evidence the policymaker was aware of it. But I think the more important point is that if either an immediate supervisor or the deputy believed that he needed more training, the record shows that we had provided an abundance of training, and that was always available. And Deputy Brewer testified in his deposition he knew how to use a taser. He was comfortable with tasers. He had had a taser used on him during one of his courses. So if somebody, if he's having a fear of taser use, and he tells his immediate supervisor there's abundant training that they could have given him, and so that's not on the Harris County, is that your position? That's correct. That his immediate supervisor should have gotten him more training on tasers? It was always available, and the policy 501 specifically says that if there's supervisors, immediate supervisors are to review the training needs and they're to act on those training needs if they're necessary. I think if we look, that was actually the third point I was going to bring, but if we look to the deputy's training record, he was eminently qualified as a deputy. He had 54 credits towards a master's degree. He had an advanced peace officer certificate, 5,428 hours of training and coursework, well above state requirements. Was that all before his traumatic incident? Before and after. The training was an ongoing option that was available to him and mandated under state law. If a person has a traumatic incident, like that they don't want to use their taser, should they be having a taser and carrying it around and having that as the option or should it be substituted out? Well, there's no question that tasers, we believe both as a practical matter and a matter of law that tasers were the best options. I mean, the only alternatives that our opponents have suggested are batons, beanbag shotguns, other options that are unwieldy or not as commonly used. So taser was the best option in this scenario? That's correct. As a matter of fact, if you look at the record of evidence, the experts, that was the first line recommended in this situation. Both experts agree that taser was the best? Well, I think Plaintiff's expert, I don't recall him even disputing that. I mean, tasers are sort of, I think what he wanted was there to be more options and for the officers to be kind of weighed down. But taser is the first option, which is even what the people on the street filming the thing thought. Correct. Common sense. That's correct, Your Honor. So looking at the policies, I don't think anyone disputes that our policy was good. And it addressed, specifically cited Graham v. Conner, talked about Graham v. Conner and other relevant laws. The Texas Penal Code explains when force could be used. It required deputies to render aid. It requires each supervisor to evaluate deputies' need for additional training and equipment. And that portion is on page 2548 of the record, that part of the policy. So as far as our policymaker was concerned, any deputy who needed training got the training. So the second policy that was talked about is the equipment policy that the court addressed. Again, there's two components to that. The practical matter, and appellants have never explained to us, their expert has never explained to us why batons, pepper spray, and a beanbag shotgun would have been better options than a taser. And then more importantly for this Court's analysis, as a legal matter, they never explain why there's a constitutional requirement to have beanbag shotguns and batons of the other weapons. And certainly they've never explained how Harris County was deliberately indifferent in not issuing this arsenal. There's no case that says if you don't issue all of those things, you're . . . That's correct, Your Honor. All of . . . No case law at all, nothing to show any of the elements under Monell. It wasn't addressed at oral argument, but there was also . . . And if the Court wants me to address it, I can address the discrimination. The third policy was the general discrimination policy. You know, what . . . I'm sorry, pattern. What our opponents have said is that there was a pattern of discriminating based on race, and in Peterson v. City of Fort Worth, this Court has held that to have a pattern, you have to have a sufficiently number . . . sufficiently numerous prior incidents, taking into account the size of the police department. In that case, 27 incidents of excessive force in four years among Fort Worth's 1,500 officers wasn't enough. Harris County Sheriff's Office is three times . . . more than three times that size. Even in the Court below, they had 23 allegations of excessive force. Most were unfounded, completely dissimilar, or didn't involve the Sheriff's Office at all. An example of that is Coates, which involved a constable's office, which is under a separate elected official, separate policy makers, separate policies. The reports that were given, that they cited as an example, the first dealt with traffic stops, not situations like this. And then the second problem with that report is it couldn't show what a policy maker knew in 2018, because the report wasn't actually issued until three years later in 2021. So it couldn't be used as evidence at all, and we objected to it. They also cited a 2009 Justice Department report about conditions in the jail. In Hicksfields v. Harris County, this Court held that even two years later, that was a stale report. And also, that dealt only with the jail, and this was a patrol incident. Completely separate incident, completely separate policies,  Does it matter anything about the City of Houston? No. No, Your Honor. We're separate elected officials, separate policies, separate everything. There was also some discussion in the briefs about the failure to render medical aid, but I think, number one, Policy 504 requires it. The video evidence shows that within eight seconds of firing his weapon, Deputy Brewer was rendering aid. Twenty-five seconds later, he notified dispatch he needed emergency services. Two minutes later, you can hear the sirens on the audio. Even if we were applying a simple negligence standard, Deputy Brewer was not negligent in failing to render medical aid, but certainly under Monell, there's no question that summary judgment was proper. We've talked about the failure to train. The last Monell claim, you know, the appellants concede on page 3571 of the record that, quote, Brewer's training regimen comports with state law requirements. This Court has held in Sanders-Burns v. City of Plano and Conner v. Travis County that when an officer complies with state training requirements, a plaintiff must show why those standards are inadequate, and appellants haven't done that. They actually have a duty to attack the state of Texas standard requirements, not just Harris County's, and I didn't see any effort anywhere in the briefing to do that. Brewer was taught that under these circumstances, he was supposed to wait for backup, and he was supposed to use a taser under these circumstances. There was no requirement that that be repeated every year, no state requirement, no federal requirement anywhere, and he testified at deposition he was comfortable with tasers. There was an issue brought up in question. You're saying he should have called for backup. He might have felt more comfortable using it. You shut down Greens Road, which is a pretty busy intersection there, right? Yes, ma'am, and the backup arrived very quickly. I mean, when he radioed for an ambulance, we heard that siren within two minutes. We have a lot of patrols. We have a lot of officers and resources in Harris County. Which precinct was this in? I don't know the answer. He was the sheriff, so he covered the entire county. The constables have precincts. Right, right. One other thing, the Americans with Disabilities Act, I would refer to the court, and I'm running out of time, but 28 CFR 35.104 doesn't require a public entity to accommodate a person's active use of illegal drugs. Second, even if Mr. Thomas was qualified under the ADA, which he wasn't because of that CFR, Harris County wasn't aware of the fact that he was disabled and it wasn't open and obvious what accommodation he needed, and then I'm out of time, but there was a third point in my brief. I can answer the question if the court has any questions. No, sir. Thank you. All right. Mr. O'Connor. Thank you, Judge. I'll address first a few points that Mr. Cobb raised up. Let me just ask you real quick, and you give me a real quick answer. On the ADA claim, references made to Section 504 of the Rehabilitation Act, I know they sort of have similar standards and such, but there's really no briefing about why you were citing to the Rehabilitation Act. Is that just to show the similarity to the ADA or what? Exactly, Your Honor. Just as a point of reference. Your whole section on that was what, four lines? Four lines might be a little short, but it wasn't much longer than that, Your Honor. All right. Thank you. Okay. Very good. To your point, Your Honor, I think it had been discussed with counsel whether we needed a controlling case for the issue with . . . for a clearly established right. The Supreme Court says it doesn't need to be a specific on-all-fours case. There needs to be sufficient precedent to put this issue beyond debate. That's the language. But we respectfully say that Judge Hohen saying that there needs to be a controlling on-point case, that was incorrect on that issue. You had discussed with counsel, and I think I agree with his assessment of where Mr. Thomas was vis-a-vis Deputy Brewer at first. He was kind of at the corner on another side of an intersection, and then his car was on kind of the other corner of it, and he advanced towards him. Again, I think this all goes to an issue of whether it's a fact question, but the point is the four feet was not where he was throughout the whole process. This is . . . I think I speak for counsel. It's just us kind of viewing the video and assessing it on our own. Is it your argument, if you were to go to a jury, that he should have used the taser rather than the gun? Certainly that. Okay, but . . . And more, but yes, and that, sorry. But there's no . . . We can't set a constitutional standard as for what is lesser acceptable force. The constitutional standard that you could set would be deadly force versus excessive force. Well, cops get sued all the time for using tasers when there are adverse medical events. Your Honor, as counsel said, there are cases where use of taser is excessive force. I think that maybe leans into our argument about having access to less. I think it was asked during counsel's arguments, why have these other types of options? Because tasers can be excessive. Counsel is exactly right. There are cases we cited. I believe it was the Kansari case where a taser was found to be excessive force. I know that. That's what I'm saying. How can we say that there is a genuine fact issue about the use of a gun as excessive force when the alternative is also potentially lethal or excessive force? I guess . . . In other words, we're not making . . . We're not competent to make policy for police use of force. I would make that point. I understand, Your Honor. I think what I'm trying to say is why doesn't that go to a jury about whether the taser was better? Well, to prevail against a county, you have to show that it was excessive force, period. And you said that your argument would be, well, he could use a taser, but a taser is certainly not without very serious risks also. One of which is that it doesn't work. The other of which is that with guys like this, you have these adverse consequences. And then to prevail against Deputy Brewer, you have to show that no reasonable officer would have used a gun in these circumstances. Right. I guess to your first point about prevailing against the county, this is . . . You asked before, would you rather he use a taser than a gun? Yes. But we also . . . there's more to it than just that that we're asking. Well, I asked whether it was your argument. All right. Yes, I know . . . You see what I'm saying, Your Honor? Obviously, those being the options, the taser should be used. We argue there should be other options. Doesn't Tennessee v. Garner tell us not to have deadly force when they're not facing a deadly force problem? Tennessee v. Garner could not be more clear of the standard. I'm running near my time, but I think it's a good way to end. You cannot use deadly force, which a gun certainly is, unless there is an immediate threat of significant harm to the officer or others. Our point in this case is that is not an issue that we're seeing here. So no reasonable officer could have possibly perceived that this deranged man with his pants down around his ankles, clearly deranged, going steadily toward him while the officer is saying, stop, stop, get down, get . . . No reasonable officer could have perceived a threat. And adding into that, that this man had been pushed by someone and had not done anything, our argument is, yes, there's no reasonable officer that would believe that. Okay. Thank you, Your Honor. I'm sorry. Can I ask just one question? What is in the record, if anything, about the fact that Brewer saw another person push the decedent? You actually see it on the video. It's well . . . Oh, that he saw it. I'm sorry, Your Honor. It's in its own . . . Brewer knew it. In his deposition, Your Honor. And he said, what did he say? I don't have the exact words in front of me. I saw him push the man. Okay. He said, I saw him push . . . I believe that's what he said. Wait. Don't say you believe. What did he say? I don't have those words in front of me, Your Honor. I can't say that in good conscience. Thank you. Thank you very much. You ought to know that. Thank you. Well, in any case, it's good of you to step in at the last minute rather than asking for a continuance. Thank you. I've got a string of oral arguments recently where somebody asked for continuances, and you represented your client quite well under the circumstances. So I compliment we all actually moved it up a day, too. So happy to accommodate the court. There you go. Thank you. All right.